**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/28/23

| | |
|---|---|
| WARNER, | |
| Plaintiff, | |
| -against- | |
| AMAZON.COM, INC ET AL., | |
| Defendants. | |

**22-cv-05907-ALC**

**OPINION & ORDER**

**ANDREW L. CARTER, JR., DISTRICT JUDGE:**

Plaintiff Gabrielle S. Warner ("Plaintiff" or "Warner") brings this action against Defendants Amazon.com, Inc. ("Amazon"), Amazon Content Services, LLC, Animal Kingdom, LLC ("Animal Kingdom"), Big Indie Pictures, Inc. ("Big Indie"), Mariama Diallo, and DialloGiallo, Inc. ("Defendants") for copyright infringement of her screenplay entitled *The Board* by Defendants' screenplay entitled *Master*. Defendants move to dismiss Plaintiff's Amended Complaint ("AC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil of Civil Procedure. For the reasons set forth below, the Court finds that Plaintiff's Amended Complaint fails to state a claim of copyright infringement. Defendants' motion to dismiss is **GRANTED**.

## BACKGROUND

### I. Factual Background

The following facts are taken from the allegations contained in Plaintiff's Amended Complaint, which are presumed to be true for purposes of this motion to dismiss.

### A. The Parties

Plaintiff Warner is an African American screenplay writer who engaged in creating original scripts intended for films or television. AC ¶ 18. Plaintiff created *The Board*, the alleged original

work[1] and "she initially registered a copyright on March 21, 2005 with the United States Copyright Office." *Id*. She also registered *The Board* with the Writers Guild of America, West. Inc. on or about March 21, 2005. *Id*. Defendants Mariama Diallo, DialloGiallo, Inc. and Amazon Content Services, LLC. are the copyright holders of the alleged infringing work, a screenplay entitled *Master*. *Id*. ¶ 21. Plaintiff alleges that "the production companies attached to the Infringing Work are Defendants Amazon, through its wholly owned subsidiary or division, Amazon Studios, Animal Kingdom and Big Indie." *Id*. ¶ 22.

## B. Background

Plaintiff alleges that the original script *The Board* was "inspired by events witnessed by [her] in the fall of 1989, as a freshman at the prestigious HBCU ["historically Black college or university"], Hampton University." *Id*. ¶ 19. Plaintiff lived in Virginia Cleveland Hall, which was then the primary dorm for freshman females, as well as one of the oldest buildings on the Hampton University campus. *Id*. Warner alleges that she stayed in "room D4, the uppermost room on the far right of the building," and that she wrote these "exact same details of the location of the dorm room" into her screenplay. *Id*. During her freshman year at Hampton University, Ms. Warner and her dorm mates were "made aware of the legend attached to their new home, Virginia Cleveland Hall[;] [t]he legend suggests that a female named Kitty, who was said to be pregnant at the time of her death, allegedly committed suicide in the dorm by hanging herself in the attic sometime in the 1800's." *Id*.  Plaintiff alleges that "most freshman females who have attended Hampton University, particularly those who had the opportunity to reside in Virginia Cleveland Hall, are aware of the legend of Kitty and the presence of her spirit in the dorm." *Id.*

---

[1] The Amended Complaint refers to *The Board* as the "Original Work" and the *Master* as the "Infringing Work" throughout.

The AC alleges that Ms. Warner's screenplay *The Board* "was based on her real-life experiences while residing in Virginia Cleveland Hall." *Id*. She alleges that "Kitty" was renamed "Eva" in the screenplay *The Board* and that in *Master*, "a similar character is renamed 'Margaret Millet.'" *Id*.

In early 2005, Ms. Warner attended a writing class at the Frederick Douglass Creative Arts Center in New York City. *Id*. ¶ 20. The class consisted of approximately twelve to fifteen students and one instructor. *Id*. "The class focused on the basic rules of screenwriting and the art of storytelling for the purpose of aiding the students' aspirations of becoming screenwriters with works that would be produced." *Id*. The class format consisted of choosing one student per week to submit their copyrighted script to the entire class and instructor, via email. *Id*.  Days later, the students and the instructor would critique the script and share constructive criticism with the writer during class. *Id*.  Ms. Warner submitted her script for *The Board* to the class "after registering it with both the U.S. Copyright Office and the WGA West on March 21, 2005." *Id*.

After Plaintiff discovered that the movie *Master* aired on Amazon Prime, Plaintiff discovered that film production for the *Master* began on or about February 24, 2020, that filming was halted in response to the COVID-19 pandemic on or about March 12, 2020, and that after film production resumed in January 2021, the film was completed on or about March 2, 2021. *Id*. ¶ 21. The Plaintiff alleges that the screenplay for *Master* was filed with the U.S. Copyright Office on January 22, 2020; the short form assignment associated with the copyright for *Master* was not registered until February 27, 2020. *Id*.

**C.  The Allegedly Similar Works**

It is well settled that in ruling on a motion, a district court may consider "the facts as asserted within the four corners of the complaint" together with "the documents attached to the

3

complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp*., 602 F.3d 57, 64 (2d Cir. 2010) (quoting *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007)). "In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Id*. (collecting cases) (internal quotation marks and citations omitted). Because both screenplays are incorporated by reference into the Amended Complaint, the Court will include a brief description of both.

1. **The Board**[2]

The Board opens in the late 1800s with a Native American woman, Eva, sitting in a dormitory and talking to her sister, Mary. *See The Board*, ECF No. 55-1. at 1–2. The pair discuss Eva moving into a "home" that will take care of her and her unborn child. *Id*. The next morning, Mary wakes up to a note from Eva stating that she is "ashamed of how [she has] disgraced" her family and that she had "no other choice." *Id*. at 3-4. A cleaning woman finds Eva's lifeless body hanging from the rafters in the attic. *Id*. at 4.

The screenplay then skips to the "present day," when students are moving into Bowlin University, a historically Black college in Virginia, and the same school where Eva hanged herself. *Id.* at 4–5. The screenplay introduces four young women: Jasmine Moore, who drives to college with her mother, while complaining about leaving her boyfriend Steven; Adrian, Jasmine's roommate, and the two women who live across the hall, Keisha and Miko. *Id.* at 5-11. Jasmine and Adrian live in Room 401. *Id*. at 8. After their families leave, the four women attend "freshman orientation," explore the school campus, and end up in the dormitory's "creepy" attic. *Id*. at 12–

---

[2] Defendants attached a copy of the registered version of *The Board* as Exhibit 1 to the Declaration of Amanda B. Levine ("Levine Decl."). *See The Board*, ECF No. 55-1.

17. Their RA Treece then tells them that, according to school legend, a girl named Eva hanged herself in the attic and still haunts it. *Id*. at 18.

The next morning is class registration day, but Jasmine sleeps through her alarm, is late for registration, and gets "the worst schedule" of classes. *Id*. at 20–23. Later that day, Miko, Jasmine, Adrian, and Keisha leave school to spend the weekend at Miko's family's home. *Id*. at 24. There, the women decide to play with Miko's Ouija board, which Miko explains can be used to communicate with the dead. *Id*. at 27–32. The next day, Jasmine wakes up feeling sick. *Id.* at 33. She asks her friends to drive her back to school. *Id.* at 33. She vomits in the school bathroom and then she is led by a "whispering breeze" to the dormitory basement. *Id.* at 35–37.

There, she finds another Ouija board, which she brings to her room. *Id.* The next day, Jasmine takes a pregnancy test at Adrian's suggestion, and she learns that she is pregnant. *Id.* at 38–39. When she calls her boyfriend Steven to tell him, he gets angry and says they are not ready to have a child. *Id.* at 40-41.  Jasmine returns to her dorm, where she takes out the Ouija board. *Id.* at 42. She says that she believes Eva is messing up her life, and she uses the Ouija board to summon Eva's spirit. *Id.* at 42-43. Eva's spirit appears and the "oracle" spells the word "sister," "suicide" and "Mary". *Id*. at 45. Adrian believes Eva is telling her that her sister *Maya* is in danger, and she calls home. *Id*. at 46. She discovers her sister was in the hospital after experiencing a "scare" related to sleeping pills. *Id*. at 47–48. The oracle on the Ouija board then spells out "I'll be waiting in the bathroom for you Keisha." *Id*. at 49. Upon seeing this, Keisha decides to not go to the bathroom and urinates into a "large Slurpee cup" in the dorm room. *Id*.

Over the next few weeks, Jasmine's boyfriend repeatedly tries to get in contact with her, but she ignores him. *Id.* at 50, 52. Jasmine also explores the attic on her own. *Id.* at 53–54.  Eva sees her and then proceeds to follow Jasmine when she leaves the attic. *Id*. Later, Adrian tells

Jasmine that she went to the library to see if she could find any information about Eva that may be able to help them figure out what she wants from them. *Id*. at 60. She finds a student registry stating that Eva was dismissed from Bowlin for "immorality" after it was learned that she had "contracted a venereal disease" and that she lived in Room 401.  *Id*. at 61.

Meanwhile, a popular football player asks Keisha on a date. *Id.* at 62. The night of the date, while Keisha is getting ready, Eva's spirit leaves the Ouija board and follows her. *Id.* at 63. While Keisha is at a football game, Jasmine, Adrian, and Miko go the library and "sit huddled viewing records via microfiche" and they stop on a story entitled "Alleged Rape at Bowlin University" including a hand drawn picture of a "young Native girl." *Id*. at 64–65. They realize that Eva was raped and was to be sent to a home before she killed herself. *Id*. at 64–66.

  After the game is over, Keisha's date invites her into the locker room. *Id.* at 67. They begin to have sex, but the date then calls over his teammates, who each rape her. *Id.* at 70–71. At the same time, the screenplay flashes back to scenes of Eva being raped (and the audience learns this is how Eva got pregnant). *Id.* Also, as Keisha is raped, Steve arrives on campus and gets into an altercation with Jasmine, and he violently grabs Jasmine's neck. *Id*. Keisha escapes and runs back to her dorm hall. *Id*. at 71. Keisha is then taken away by an ambulance and drops out of school. *Id.* at 72, 75-7.

The screenplay then features a dream sequence where Jasmine hangs herself in the attic. *Id*. at 73–74. Ultimately, Adrian, Miko, and Jasmine realize that they can clear Eva's name by burning her records. *Id.* at 78. They do so, and Eva thanks them on the Ouija board. *Id.* After Eva's spirit is freed, the screenplay jumps to a visibly pregnant Jasmine who is happily engaged to her boyfriend, and her friends look forward to the next school year. *Id.* at 81. The screenplay then flashes to "three months later" when freshman are again moving into the dorm. *Id.* at 83–84.

Two RAs walk by the room previously inhabited by Jasmine and Adrian and see Eva and Mary

sitting on the bed in modern clothing. *Id.*

2. **Master**[3]

Defendant Mariama Diallo is the author of the *Master* screenplay.[4] *Master* tells the stories

of Gail Bishop, the first Black "master" of a prestigious northeastern college named Ancaster

College, and Jasmine Moore, a Black student starting her freshman year at the school. *See*

*generally Master*, ECF No. 55-2. The screenplay begins with Gail moving into the master's house

on campus. *Id.* at 1. As she explores the home, she looks at a photograph indicating that it was

previously run by Black servants. *Id.* at 3. Gail feels uncomfortable in the home, and this

uneasiness is compounded by other professors who focus on the fact that she is the first Black

master of the school. *Id.* at 13–15.

At the same time, when Jasmine first arrives on campus and attends a freshman welcome

speech that is given by Gail, she learns that the school is rumored to be haunted by Margaret

Millett, a woman who was hanged near campus for witchcraft. *Id.* at 1, 4–5. According to a school

legend, each year, Millet's ghost shows herself to one freshman and, on December 3, the day of

her hanging, she takes the student with her. *Id.* at 9-10. Later, Jasmine goes to the library and

searches "Belleville room 117+death." *Id.* at 18. She looks for one particular article that is only

available on microfiche/microfilm and she ultimately discovers that her room belonged to Louisa

Weeks, the first Black woman student at the college who committed suicide by jumping out of the

---

[3] Defendants attached a copy of the registered version of *Master* as Exhibit 2 to the Levine Declaration. *See Master*, ECF No. 55-2.

[4] According to Defendants, *Master* was released on Prime Video, Amazon's streaming service on March 18, 2022. Mot. at 5. Defendants characterize *Master* as a "horror film." *Id.*

window on December 3. *Id*. at 18, 35. The implication here is that she was the freshman "chosen" by Millett's ghost. *Id*. at 18, 35.

Throughout the semester, Jasmine grows increasingly troubled. One night she sees someone standing in the corner of the bathroom, but when she turns the light on, the person is nowhere to be found. *Id*. at 11. On another night, she has a nightmare that she is being scratched by a pale hand that comes from under the bed and wakes up with scratches on her arms. *Id*. at 20. Another time, she dreams that a tour group has come into her dorm to watch her sleep and, while she is sleeping, a hooded woman puts a noose around her neck. *Id*. at 43–44. Jasmine wakes up with bloody scratches on her neck. *Id*. at 44.

Jasmine also experiences overt racism and hostility at the school, including someone defacing the photograph of her hanging on her door, *id.* at 31, a cross-burning on the school's lawn, *id.* at 62, as well as microaggressions from her roommate, other white peers, and staff, *e.g., id.* at 9 (a peer using a "blaccent" when speaking with her); 10 (librarian telling Jasmine she is "well spoken" and suspecting her of stealing books).

Jasmine additionally struggles in an English class taught by Liv Beckman, one of the few Black professors at the school. *Id*. at 21–22, 26. When Jasmine goes to Liv's office to discuss a class assignment, Liv suggests that the transition to college can be hard for students from "disadvantaged" backgrounds even though Jasmine came from a wealthy suburb and was valedictorian of her high school. *Id.* Jasmine later receives a failing grade for her paper. *Id*. at 26. Jasmine ultimately meets with Gail to file a grievance about Liv. *Id.* at 27. This creates an internal struggle for Gail, who is friends with Liv and hopes she will receive tenure. *Id*. at 38. During Liv's tenure meetings, after white faculty members suggest that Gail cannot be "impartial" about Liv's

tenure decision, Gail states she has some doubt about Liv and points to Jasmine's complaint against Liv. *Id.* at 37-38.

Later in the screenplay, Gail runs into two boys in the woods and then finds Amelia, Jasmine's roommate, crying and bruised, implying that they may have raped her. *Id*. at 52. Amelia decides to leave campus "forever." *Id*. at 54. Meanwhile, Jasmine increasingly feels that she is being haunted by Millett's ghost, and she even receives an envelope containing clumps of hair and a snake. *Id*. at 55. On December 3, after spending all night in the library reading about Louisa Weeks, Jasmine heads back to her dorm in the early morning hours. *Id.* at 69. On her walk back, she sees a hooded woman advancing slowly towards her. *Id.* at 71. She first runs to the master's house. *Id.* She then runs to her room and tries to lock the door, but the doorknob begins to rattle. *Id.* As she sees the door to her room opening, she climbs out the window, slips, and tumbles to the ground. *Id.* at 72.

Gail is called by a hospital administrator, and she goes to Jasmine who is lying in a hospital room with a broken arm. *Id*. at 74. Gail inquires what happened and Jasmine tells Gail "there are ghosts at the school" and insists that she wants to transfer. *Id.* at 75–76. Gail responds, "It's not ghosts, it's not supernatural. It's America and it's everywhere," implying that Jasmine is not being haunted by spirits but, instead, dealing with racism. *Id.* at 76.

Jasmine returns to school, but soon hangs herself in her dorm. *Id.* at 85. Gail finds Jasmine's lifeless body, and her death greatly affects Gail. *Id.* Gail blames herself and Liv for Jasmine's death. *Id*. at 87. In what is seen as an effort to avoid any more scandals on campus, the college awards Liv with a tenured position. *Id.*  Afterwards, Gail meets with a woman named Ruth who claims to be Liv's mother. *Id*. at 93. The woman tells Gail that Liv is not actually Black. *Id.* Gail then confronts Liv at a party about her mother's comments, but Liv explains that her mother is abusive and lying. *Id.* at 96–99. Liv leaves the party, putting on a hooded coat similar to the figure

that chased Jasmine earlier in the script. *Id.* at 99. Gail also leaves the party and is approached by school security. *Id.* at 101. When the guard asks for her identification, Gail tells him she does not work at the school. *Id*. The screenplay appears to end in a feeling of somberness.

### D.  Plaintiff's Allegations of "Striking Similarities"

Plaintiff alleges that *Master* is "strikingly similar to Ms. Warner's 2005 copyrighted script for *The Board*." AC ¶ 21. The AC includes a list of thirty-five alleged "striking similarities" between the two works. *See* Exhibit A to AC, ECF No. 50-1. These alleged similarities include, *inter alia*, (1) both screenplays "open . . .  with a description of the large, ominous dormitory;" (2) both screenplays feature a lead character who is an African American college first-year student named "Jasmine Moore"; (3) both screenplays include a scene of Jasmine moving into her college dormitory and unloading luggage; (4) in both *Master* and *The Board*, Jasmine has the "haunted" dormitory room; (5) "in both *Master* (feature film)[5] and *The Board* screenplay, Jasmine's 'haunted room' is the room located on the top floor, farthest right side of the dormitory" (6) both screenplays include a "haunted attic"; (7) both screenplays feature a scene where the incoming freshman students are addressed with a speech detailing the respective school's historical importance; (8) "in both [screenplays], a legend tied to the respective campus involves a woman from years back that died as a result of a hanging"; (9) both screenplays contain "scenes pertaining to inappropriate urination in a location other than a bathroom"; (10) in both *Master* and *The Board*, "Jasmine and/or Jasmine and her roommates (respectively) are warned about the haunting of the dorm (room) by a woman that died in the dorm in years past"; (11) in both screenplays, research in the school library

---

[5] It is somewhat unclear if Plaintiff exclusively references registered *Master* screenplay or both the screenplay and the *Master* film that she viewed on Amazon Prime in her Amended Complaint. Defendants point this out in their motion to dismiss, but Plaintiff does not address this in her opposition. Therefore, the Court refers only to the *Master* screenplay that is attached to the Declaration of Amanda B. Levine. *See* ECF No. 55.

uncovers that the "ghost" once resided in Jasmine's dorm room and the characters search for articles at the campus library using microfilm/microfiche; (12) both screenplays feature a scene in which Jasmine unknowingly oversleeps as a digital clock tracks the lapse of time; (13) in both screenplays, Jasmine's dorm is "one of the oldest building on campus being erected in the 1800s"; (14) both screenplays feature "a scene that takes place in a barn filled with White People" and (15) in both *Master* and *The Board*, one of Jasmine's dormmates is raped," "needs medical attention after the rape," and "gives up on trying to pursue action for fear of the fallout it would cause on their reputation." *See* Ex. A ¶¶ 1–35.

The AC alleges claims for (1) declaratory relief; (2) direct copyright infringement; (3) contributory copyright infringement; and (4) vicarious copyright infringement. *See* AC ¶¶ 24–40.

## II. Procedural Background

On July 11, 2022, Plaintiff Warner filed her initial complaint in this action. ECF No. 1. On September 19, 2022, Defendants filed a pre-motion letter requesting permission to file a motion to dismiss the complaint. *See* ECF No. 33.  During a pre-motion conference, the Court granted Plaintiff permission to amend her complaint and directed the parties to file a joint letter advising the Court on whether Defendants still wished to move to dismiss. *See* ECF No. 47.  Plaintiff filed the AC on December 6, 2022. ECF No. 50.[6] On December 27, 2022, the Defendants filed a letter explaining they wished to move to dismiss Plaintiff's AC and proposed a briefing schedule. ECF No. 51. The Court granted Defendants leave to move to dismiss and adopted the parties' briefing schedule. On January 26, 2023, Defendants filed their motion to dismiss, ECF No. 53, alongside a declaration, ECF No. 55, and a memorandum of law. Mot., ECF No. 54. Plaintiff filed her

---

[6] Plaintiff's initial complaint included an additional defendant, Tracey Cherelle Jones. *See* ECF No. 1. Ms. Jones has now been dismissed from this action and all allegations relating to her have been removed.

opposition on March 10, 2023. Opp., ECF No. 60. On March 31, 2023, Defendants filed their reply memorandum. Reply, ECF No. 31. The motion is deemed fully briefed.

## LEGAL STANDARD

### I.  Rule 12(b)(6) Standard

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy*, 482 F.3d at 191. However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id*. at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678, (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## DISCUSSION

### I.  Copyright Infringement

The Copyright Act provides the owner of a copyrighted work with "the exclusive right to . . . reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). To prevail on a claim for copyright infringement, the plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 439 (S.D.N.Y. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991), *aff'd sub nom. Muller v. Anderson*, 501 F. App'x 81 (2d Cir. 2012)). As to the first element, Defendants do not contest that Plaintiff owns a valid copyright to *The Board*. For the purposes of this motion to dismiss, the Court assumes that Warner owns a valid copyright in *The Board*, as pleaded in the Amended Complaint.

To satisfy the second element of a copyright claim, "a plaintiff 'must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work].'" *Abdin v. CBS Broad. Inc.,* 971 F.3d 57, 66 (2d Cir. 2020) (emphasis in original) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001)).

Defendants argue that Plaintiff has not adequately alleged a claim of copyright infringement because (1) she does not allege that Defendants had access to *The Board*; (2) the works, *The Board* and *Master*, are not strikingly similar and (3) the works are not substantially similar. Defendants also argue that Plaintiff has not adequately plead contributory or vicarious copyright infringement.

### A. Access

"Actual copying can be shown through either (1) direct evidence of copying or (2) circumstantial evidence that the defendants had access to the plaintiff's work." *Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 327–28 (S.D.N.Y. 2021) (citing J*orgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003)). Such circumstantial evidence can be demonstrated through either (1) "a particular chain of events . . . by which the defendant might have gained access to the work," or (2) facts showing "that plaintiff's work was 'widely disseminated," such that access can be inferred." *Id*. (citing *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000)) (internal citation omitted) and (*Webb v. Stallone*, 910 F. Supp. 2d 681, 686 (S.D.N.Y. 2012)).

"A work is 'widely disseminated' when it has had 'considerable commercial success' or is 'readily available on the market.'" *Stallone,* 910 F. Supp. 2d at 686 (quoting *Silberstein v. Fox Entm't Grp.*, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004)). "Access can be inferred where 'a party had a reasonable possibility of viewing the prior work.'" *Clanton*, 556 F. Supp. 3d at 328 (S.D.N.Y. 2021) (quoting *Boisson v. Banian, Ltd*., 273 F.3d 262, 270 (2d Cir. 2001)). "'A reasonable possibility' is not simply a 'bare possibility'; 'access cannot be based on mere speculation or conjecture.'" *Muller*, 794 F. Supp. 2d at 440 (quoting *Jorgensen*, 351 F.3d at 51).

Here, Plaintiff has not alleged direct evidence of copying and therefore she must rely on circumstantial evidence as mentioned above. Plaintiff alleges that in 2005, she attended a writing class where she shared her script with "twelve to fifteen students and one instructor" AC ¶ 20, and that "Defendants had access to the Original Work and gained such access by obtaining actual copies of the Original directly or indirectly through her classmates or instructor, or third-parties connected to them, who received the Original Work directly from Plaintiff, without authority or

permission or license from Plaintiff to use the Original Work to produce any other work derived from the Original Work." AC ¶ 31. In her opposition to Defendants' motion, Plaintiff also argues that the "copyright registration of the 2005 Original Work, together with the subsequent distribution of the 2005 Original Work to [her] classmates and her instructor in her 2005 writing class provides circumstances sufficient that a determination as to proof of access by the Defendants requires discovery that is not possible at this stage of the litigation." Opp. at 5.

The Court finds that Plaintiff has not adequately alleged access. As an initial matter, A valid copyright is not, as Plaintiff seems to suggest, probative of access. A valid copyright is the first element in a copyright infringement suit and a prerequisite to bring a copyright infringement claim. *See Fourth Estate Public Benefit Corp. v. Wall-Street.com*, 139 S. Ct. 881, 892 (2019) (explaining that §411(a) bars a copyright owner from suing for infringement until "registration . . . has been made" and that "registration" of a copyright claim occurs, and a copyright claimant may commence an infringement suit, when the Copyright Office registers a copyright). Plaintiff has provided no support for her proposition that the Court should consider the valid copyright when addressing access. More importantly, Plaintiff's allegation that she shared her screenplay with, at most, sixteen individuals is not sufficient under the "wide dissemination" standard because she has failed to allege that that her screenplay had "considerable commercial success" or was "readily available on the market." *Stallone,* 910 F. Supp. 2d at 686.

In her opposition, Plaintiff argues that her allegation that she participated in screenwriting class where her work was presented to her classmates and instructor is instead the "start of a chain of events that Plaintiff should have the opportunity to explore during the discovery phase of the case." Opp. at 6. However, Plaintiff does not plead any connection or connecting event between anyone from her writing class and any of the Defendants. Therefore, this allegation of access is

based on mere conjecture, which this Court cannot rely on. *Clanton*, 556 F. Supp. 3d at 328 ("access cannot be based on mere speculation or conjecture."). Similarly, this speculative assertion does not support a "chain of events." Plaintiff essentially asks the Court to infer the screenplay somehow got into Defendants' hands without ever alleging any connection between her classmates and the Defendants.[7] Therefore, Plaintiff fails to adequately plead access.

Even if the Court were to find that Plaintiff has adequately plead access, for the reasons set forth below, dismissal of Plaintiff's claims is warranted because the Court finds that Plaintiff's work is not "substantially similar" to Defendants' screenplay.[8]

---

[7] In her opposition, Plaintiff further argues that access must be decided at the summary judgment stage and not the motion to dismiss stage. Plaintiff cites to *Gayle v. Villamarin*, No. 18-cv-6025, 2021 WL 2828578, at *6 (S.D.N.Y. Jul. 7, 2021) where the court granted a motion for summary judgment and held that no reasonable jury could find the defendant had access to the plaintiff's copyrighted image. However, Plaintiff provides no case law supporting the proposition that a court cannot assess the sufficiency of allegations regarding access at the motion to dismiss stage. Additionally, courts within this circuit frequently assess the sufficiency of allegations regarding access in copyright infringement cases at this stage. *See, e.g.*, Clanton, 556 F. Supp. 3d at 330 (finding that "[t]he similarities between the two compositions are not sufficiently striking to overcome the access requirement" at the motion to dismiss stage); *Jones v. Atl. Recs.*, No. 22-CV-893 (ALC), 2023 WL 5577282, at *4 (S.D.N.Y. Aug. 29, 2023) ("The Court finds that Plaintiff has not adequately alleged access" at the motion to dismiss stage); *Wager v. Littell*, No. 12-CV-1292 TPG, 2013 WL 1234951, at *3 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir. 2014) ("Therefore, the court finds that plaintiff has failed to plead access" at the motion to dismiss stage).

[8] "As an alternative to showing direct or indirect access, a plaintiff may prove 'access' by establishing 'striking similarity' between the works." *Wager v. Littell*, No. 12-CV-1292 TPG, 2013 WL 1234951, at *3 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir. 2014). The Second Circuit has held that "if the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Id.* (quoting *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997)); *see also Jorgensen*, 351 F.3d at 56 ("[W]here the works in question are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.") "To prove that similarities are striking, claimant must demonstrate that such similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source." *Clanton*, 556 F. Supp. 3d at 330 (quoting *Stratchborneo v. Arc Music Corp.*, 357 F. Supp. 1393, 1403 (S.D.N.Y. 1973)). The "strikingly similar" test is a "stringent" one. *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007) (internal quotation omitted), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).
The "striking similarity" test "requires, not surprisingly, more than a showing of 'substantial similarity'" *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 537–38 (S.D.N.Y. 2007). Therefore, Plaintiff's failure to adequately plead "substantial similarity" necessarily means Plaintiff has failed to plead "striking similarity."

**B.  Substantial Similarity**

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito Architecture, LLC,* 602 F.3d at 66 (quoting *Yurman Design, Inc.*, 262 F.3d at 111). When comparing works that have both protectible and unprotectible elements, a court must apply a "more discerning" test. *Id.* (*quoting Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 123 (2d Cir. 1994)). In such cases, a court "'must attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar.'" *Id.* (*quoting Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)).

In applying this test, a court is not "'to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" *Id.*  Rather, the Court is "principally guided 'by comparing the contested design's 'total concept and overall feel' with that of the allegedly infringed work,' as instructed by [its] 'good eyes and common sense . . . .'" *Id.* (internal citations omitted). To this end, the Court must keep in mind "the distinction between a work's non[-]protectible elements and its selection, coordination, arrangement, and expression of those elements—which are protectible." *City Merchandise, Inc. v. Broadway Gifts, Inc.*, No. 08–CV–9075, 2009 WL 195941, at *2 (S.D.N.Y. Jan. 27, 2009) (*quoting Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982)) (internal quotation marks omitted)). "This is so because 'the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] . . . —are considered in relation to one another.'" *Peter*

*F. Gaito Architecture, LLC*, 602 F.3d at 66 (quoting *Tufenkian Import/Export Ventures, Inc.,* 338 F.3d at 134).

When evaluating claims of infringement involving literary works, as here, "the 'more discerning' approach requires courts to consider 'similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting' of two works." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 565 (S.D.N.Y. 2009) (*quoting Boisson* , 273 F.3d at 273).

The Court can undertake a substantial similarity analysis in the context of a motion to dismiss. "When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a visual comparison of the works.'" *Peter F. Gaito Architecture, LLC,* 602 F.3d at 64 (quoting *Folio Impressions, Inc. v. Byer Cal*., 937 F.2d 759, 766 (2d Cir. 1991)). "Thus, . . .  it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Id.*  Moreover, because "in copyright [] actions, the works themselves supersede and control contrary descriptions of them," *Peter F. Gaito Architecture, LLC*, 602 F.3d at 64, "District Courts are directed to ignore lists provided by Plaintiffs of purported similarities between two works." *Hord v. Jackson*, 281 F. Supp. 3d 417, 425 (S.D.N.Y. 2017); *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) ("Although Williams points to several specific instances of similarity, we agree with the district court that such lists are 'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.' ... Such a scattershot approach cannot support a finding of substantial similarity ....").

(2d Cir. 2010) (quoting *McCarthy*, 482 F.3d at 191). "In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Id*.

### 1. Non-Protectible Elements

The Copyright Act gives owners of a copyright "exclusive rights," 17 U.S.C. § 106, to protect "original works of authorship," 17 U.S.C. § 102(a). However, not all elements of a work are entitled to copyright protection. There are limitations on the scope of protection afforded by the Copyright Act, the following of which are of particular importance in this case.

First, "ideas are not protected by copyright." *Abdin*, 971 F.3d at 67 (*quoting Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135-36 (2d Cir. 2004)) ("[C]opyright does not protect ideas; it protects only the author's particularized expression of the idea."). "[T]he protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Id.* (internal quotation omitted) (*quoting Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir. 1976). "While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91.

Second, "generic and generalized character traits such as race, gender, and hair color are not protectible." *Abdin*, 971 F.3d at 67; *see also Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."). Similarities between characters that are "mostly generalized" have been found to be unprotectible. *Id.* (*citing Alexander v. Murdoch*, No. 10-cv-5613 (PAC), 2011 WL 2802923, at *5 (S.D.N.Y. July 14, 2011)

(dismissing claim where both characters shared the same sex and hair color, as well as similar mannerisms), *aff'd*, 502 F. App'x 107 (2d Cir. 2012) and *Cabell v. Sony Pictures Entm't, Inc.*, 714 F. Supp. 2d 452, 454 (S.D.N.Y. 2010) (granting summary judgment where characters were both military-trained hairstylists who fight crime with hairdryers as weapons), *aff'd*, 425 F. App'x 42 (2d Cir. 2011)). Relatedly, "courts have not placed a great deal of emphasis on similarities in character names." *Gal*, 518 F. Supp. 2d at 547.

Third, "also unprotectible are scènes à faire . . . ." *Id.* The Second Circuit has described scènes à faire as "'sequences of events which necessarily follow from a common theme,' and 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic . . . .'" *Id.* (internal citations omitted) (quoting *Reyher*, 533 F.2d at 91 and *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)). "[E]lements of a work that are indispensable, or at least standard, in the treatment of a given topic—like cowboys, bank robbers, and shootouts in stories of the American West—get no protection." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (internal quotation marks omitted). "Copyright protection does not extend to 'stock' themes commonly linked to a particular genre." *Abdin*, 971 F.3d at 70–71 (internal quotations and citation omitted). "The scènes à faire doctrine also prevents 'stock characters' from receiving copyright protection." *Lewinson*, 659 F. Supp. 2d at 567 (quoting *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("A stock character is a stock example of the operation of the [scènes à faire] doctrine. . . .")).

## 2. The Works are Not Substantially Similar

Defendants argue that "the plots, characters, settings, themes, and total concept and feel of *Master* and *The Board* are entirely dissimilar and, for this reason . . . her copyright infringement claims must be dismissed." Mot. at 14. The Court agrees that no reasonable layperson would find the protectible elements of Plaintiff's work and Defendants' work to be substantially similar.

a. **The Plot, Sequence, Pace, and Setting[9]**

While both works involve a student living in a "haunted" dorm room and being tormented by what they believe to be a ghost, moving beyond this level of abstraction, any similarity between the plots is non-existent. *The Board* tells the story of a first-year student, Jasmine Moore, and her three friends in a historically Black university who are haunted by the ghost of Eva, a woman from the 1800s who killed herself in the attic of the dormitory building after she was raped and became pregnant. Jasmine and her dormmates communicate with Eva on a Ouija board and they clear her name by burning her records. In the end, Jasmine is happily engaged and pregnant. In *Master*, the screenplay focuses on Jasmine Moore, a first-year student, and Gail, a professor and "master" at a majority-white college, and both characters explicitly navigate the contours of racism on their campus. The college is said to be haunted by Margaret Millet, who was killed by hanging for practicing witchcraft near campus. According to campus legend, Millet's ghost shows herself to one freshman and, on December 3, the day of her hanging, she takes the student with her. *Id*. at 9-10. Eventually, Jasmine dies by suicide by hanging herself in the room and Gail quits her job as professor and master.

Plaintiff argues that "the core storyline associated with Jasmine Moore for each work is the same" and that the "exact same sequence of events [] unfold[s] for the two characters." Opp. at 6–7. Plaintiff asserts that in each work, the character that is haunting the dorm room "committed suicide by hanging"; both works feature a dormmate of the "Jasmine Moore" character who is raped by a group of boys and who "leaves the school fearing shame of others finding out"; both

---

[9] As an initial matter, Plaintiff appears to argue that the Court should focus and rely exclusively on her "comparative analysis" list attached as an exhibit to the AC. See Opp. However, as previously explained, "courts are directed to ignore lists provided by Plaintiffs of purported similarities between two works." *Hord*, 281 F. Supp. 3d at 425. The Court's analysis here "is not simply a matter of ascertaining similarity between components viewed in isolation." *Amanze v. Adeyemi*, No. 18 CIV. 8808 (NRB), 2019 WL 2866071, at *6 (S.D.N.Y. July 3, 2019), *aff'd*, 824 F. App'x 86 (2d Cir. 2020).

Jasmine characters "experience a relationship with being haunted by the ghost and their respective digital alarm clocks" and that the Jasmine character struggles with her studies immediately following her initial haunting in both *Master* and *The Board. Id.* at 7.

First, Plaintiff's characterization that both works involve a "character that is haunting the dorm room that committed suicide by hanging" is incorrect. Although this does occur in *The Board*, in *Master*, the purported ghost is a woman who was killed by hanging for practicing witchcraft—not by suicide. *See Master*, ECF No. 55-2 at 4. Second, in her opposition, Plaintiff does not point to any allegation to support her assertion that the character of "Jasmine Moore" in each work experiences the "exact same sequence of events," Opp. at 6-7. As just explained, in *The Board*, Jasmine attends a historically Black college where she learns she is pregnant and attempts to communicate with a ghost in her dorm. By the end of the screenplay, Jasmine and her friends clear the ghost's names by burning her records and she is happily engaged to her fiancé. However, in *Master*, Jasmine goes to a majority white school where she is marginalized and is the victim of racist attitudes and conduct. However, rather than seeing these events, including a cross-burning, as racism, she believes she is being haunted by a ghost of a woman who was hanged for witchcraft. At the end of the movie Jasmine dies of suicide. This is not the same plot, and it is certainly not the "same exact sequence of events."

Moreover, the two works include several tropes regularly found in horror movies and in movies set on college campuses that are not protectible elements—these are scènes à faire. For example, Plaintiff points to how both screenplays begin with scenes of students moving into their college freshman dorms, attending welcome speeches, and researching "ghosts" in a library and using microfilm. *See* Ex. A, ECF No. 50-1 ¶¶ 1–2, 4, 9, 16–17. The Court, however, agrees with Defendants that such scenes are typical of screenplays set on a college campus and therefore are

scènes à faire resulting from the fact that both works are set at a college. These scenes cannot be protectible elements unique to Plaintiff's work. Plaintiff also argues that both Jasmine characters "unknowingly oversleeps as a digital clock tracks the lapse of time, even after Jasmine's roommate attempts to wake her up." *See* Ex. A, ECF No. 50-1 ¶ 19; Opp. at 7. However, a scene depicting a college student oversleeping and ignoring their alarm clock also cannot be a protectible element unique to Plaintiff's work. Similarly, while Plaintiff claims that in both works, "there is a supernatural gravitation towards the 'haunted attic,'" *Id*. ¶ 6, the Court notes that the *Master* screenplay never directly references an attic—just a room "at the top of [a] flight of stairs" of a kitchen—and the respective "attics" serve very different purposes. In *The Board*, the attic is a central setting where Eva killed herself and where her ghost resides, while in *Master*, the "attic" is simply a room where Gail finds relics of former masters. *See Master*, ECF No. 55-2 at 3. And in any event, scenes featuring haunted attics are scènes à faire in the horror film genre.

Finally, Plaintiff appears to argue that the works are similar because they take place at colleges with old dorms constructed in the 1800s. *See* Ex. A, ECF No. 50-1 ¶ 25. However, at the outset, setting a screenplay in an old college campus is unprotectible idea. Moreover, the respective college campuses are entirely different. Bowlin University in *The Board* is a historically Black college in Virginia. Ancaster College in *Master* is a majority white college in the Northeast. Additionally, the Court agrees with Defendant's contention that this difference is essential to the plot of *Master*. The specific setting of Ancaster College helps drives the main plot of *Master* insofar that Defendants' screenplay depicts a college that is inherently unwelcoming and violent towards the main Black characters. Even though the main characters in *The Board* are also Black, such a dynamic does not exist in Plaintiff's work.

Accordingly, there is no substantial similarity in the works' plots or settings.

**b. The Characters**

Although there are commonalities between the characters, the Court is not convinced the Plaintiff has shown substantial similarity. "In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [the plaintiff's work]." *Hogan v. D.C. Comics*, 48 F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999). "The bar for substantial similarity in a character is quite high." *Sheldon Abend Revokable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010). These works do not approach that high bar.

Plaintiff first asserts that the characters of "Jasmine Moore" are similar. The Court acknowledges these characters share the same name, but as previously mentioned, "courts have not placed a great deal of emphasis on similarities in character names." *Gal*, 518 F. Supp. 2d at 547. *See Hogan,* 48 F.Supp.2d at 300, 311 (no substantial similarity despite the fact that the two works both "centered around a half-human, half-vampire character named Nicholas Gaunt"); *Sinicola v. Warner Bros.,* 948 F.Supp. 1176, 1187 (E.D.N.Y.1996) (no substantial similarity found "notwithstanding a number of identical or similar character names"). Additionally, Plaintiff herself appears to recognize that the similarity in the name "could be dismissed as mere coincidence because such a name is perhaps commonplace in the African-American community." Opp. at 6. Despite this common name and racial background, however, as explained above, the screenplays demonstrate that the characters are entirely dissimilar, and the characters follow completely differing trajectories. Jasmine in *The Board* is from New York City and is unhappy about attending Bowlin University because she is leaving behind her boyfriend. She then learns she is pregnant all the while attempting to communicate with and clear the name of the ghost in her dorm. And as mentioned many times now, her character's end is a seemingly happy life with her fiancé and

future child.  Jasmine in *Master*, on the other hand, comes from the Pacific Northwest. She does not have any serious romantic relationship, never becomes pregnant, does not attempt to communicate with spirits and her storyline focuses on her experiences as a Black woman at a predominantly white college that is seemingly unwelcoming to students and faculty of color. In the end, she dies by suicide.

Plaintiff also argues that both works feature a dormmate of the Jasmine Moore character who is raped by a group of boys, seeks medical attention, and ultimately "leaves the school fearing shame of others finding out." Opp. at 7; Ex. A, ECF No. 50-1 ¶¶ 29–32. This argument also fails. First, and most importantly, the Court notes that Plaintiff cannot copyright the idea or concept of a character leaving school after a traumatic event, such as sexual assault or humiliation. Further, the treatment of these two characters and their rapes are entirely different. In *The Board*, Keisha, the woman who lives across the hall from Jasmine, goes on a date with a football player, follows him to the locker room, and is sexually assaulted by multiple members of the football team. *See The Board*, ECF No. 55-1 at 69-71. Additionally, during this scene, the ghost haunting the dorm, Eva, flashes back to her own rape in the 1800s. *Id.* On the other hand, in *Master*, Jasmine's roommate Amelia is found in the woods by Gail, and it is *implied* that she was raped by two men. *See Master*, ECF No. 55-2 at 51. There is no graphic scene depicting sexual assault in *Master*. Also, despite Plaintiff's claim that these characters leave campus because they "fear shame of others finding out," in *The Board*, Keisha leaves partly because the other students are aware she was raped and because she believes her assailants will not be brought to justice. Opp. at 7. Plaintiff's effort to "mix and match characters and plot lines in [an] attempt to find similarities in the two works[]" fails. *Green v. Harbach*, No. 17 CIV. 6984, 2018 WL 3350329, at *6 (S.D.N.Y. July 9, 2018), *aff'd*, 750 F. App'x 57 (2d Cir. 2019). Finally, Plaintiff does not, and cannot, allege

that there exists a character that is substantially similar or parallel to the other main characters—such as Adrian and Miko in *The Board* or Gail and Liv in *Master*—in the two works.

Accordingly, there is no substantial similarity in the works' characters.

### c. The Themes

Other than the conclusory assertion that the works share "the same . . . themes," AC ¶ 32, Plaintiff does not appear to draw any parallels between the themes of *The Board* and *Master*. Accordingly, there is no substantial similarity between the works' themes.

### d. Total Concept and Feel

Finally, the "total concept and feel" of the works differs completely. *Master* tells a story from two different perspectives—that of a college student and professor—while *The Board* focuses only on the student perspective. Mot. at 22–23. In addition, the entire plot of *Master* revolves around a Black student and headmaster attempting to fit in at a majority white college, while in *The Board*, there is no similar tension in the historically Black university. Moreover, *Master* ends on a dark and somber note—Jasmine kills herself and Gail quits her job after being forced to confront the racist attitudes on their college campus. Meanwhile, in *The Board*, the screenplay ends on peaceful and happier note. In Plaintiff's work, the main characters clear Eva's name and set her spirit free, Jasmine decides to reconcile with her boyfriend and raise a child with him, and it appears Eva and her sister are reincarnated as new freshman students attending Bowlin University. Therefore, the Court finds there is no substantial similarity in the works' total concept and feel.

Plaintiff has failed to adequately plead facts supporting unauthorized copying and substantial similarity between the Defendant's work and the protectible elements of her work. Thus, she has not pled a direct copyright infringement claim.

## II. Contributory and Vicarious Copyright Infringement Claims

Plaintiff alleges that "each defendant" is liable for contributory copyright infringement and vicarious copyright infringement. AC ¶¶ 42–48. "[T]here can be no contributory infringement absent actual infringement . . . and no vicarious infringement absent direct infringement." *See Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) (citing *Faulkner v. National Geographic Enterprises, Inc.*, 409 F.3d 26, 40 (2d Cir.2005). Because Plaintiff has not plausibly alleged a claim of direct copyright infringement, her claims of contributory and vicarious copyright infringement must be dismissed. Declaratory relief is also denied. *Id*.

## III. Leave To Amend

Defendants' motion to dismiss is granted without leave to amend.  "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy*, 482 F.3d at 200).  "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA*, 758 F.3d at 505.  "Any amendment to the complaint would be inherently futile because the works are what they are." *Dreamtitle Publ'g, LLC v. Penguin Random House LLC*, No. 1:22-CV-7500-GHW, 2023 WL 4350734, at *22 (S.D.N.Y. July 5, 2023).

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss under Rule 12(b)(6) is **GRANTED with prejudice.** The Clerk of the Court is respectfully directed to terminate the pending motion at ECF No. 53 and close this case.

**SO ORDERED.**

**Dated:**    **September 28, 2023**
        **New York, New York**

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**